UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WENGER S.A.,

                Plaintiff,

-against-

OLIVET INTERNATIONAL, INC., et al.,

                Defendants.

---

20-cv-1107 (AS)

MEMORANDUM OPINION
AND ORDER

ARUN SUBRAMANIAN, United States District Judge.

## BACKGROUND

Plaintiff Wenger and Defendant Olivet own similar trademarks that are used on luggage. Wenger's word mark is "SwissGear" and is accompanied by the logo on the left; Olivet's word mark is "SwissTech," and it uses the logo on the right:

 

*See* Dkt. 282 at 10; Reg. No. 4,109,108; Reg. No. 3,820,133 (SwissGear's black-and-white version registered specifically for luggage); Reg. No. 5,840,824.

Wenger has sued Olivet for copyright infringement, common-law unfair competition, and several species of trademark infringement. Am. Compl., Dkt. 117. Olivet now moves for partial summary judgment on two of those claims: trademark counterfeiting under 15 U.S.C. § 1114 and trademark dilution under 15 U.S.C. § 1125. For the reasons below, that motion is GRANTED IN PART AND DENIED IN PART. Both Olivet and Wenger also request attorneys' fees and costs associated with the motion. Those requests are DENIED.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is "material" if it could "affect the outcome." *Id.* at 248. The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26 (1986).

## DISCUSSION

### I.  A reasonable jury could find the marks substantially indistinguishable

"A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The marks here are not identical, so the question is whether they are substantially indistinguishable. Marks are substantially indistinguishable if they "are nearly identical[,] with only minor differences [that] would not be apparent to an unwary observer." *Chrome Hearts LLC v. Controse Inc.*, 2023 WL 5049198, at *11 (S.D.N.Y. Aug. 8, 2023) (cleaned up). That observer is the "average purchaser," comparing the marks (if possible) as they appear on "actual merchandise." *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 530–32 (2d Cir. 1983).

Determining whether marks are "nearly identical" and contain only "minor differences" in the view of an "average purchaser" is a fact-sensitive enterprise. *See Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp. Inc.*, 486 F. Supp. 2d 286, 291 (S.D.N.Y. 2007) (noting that the inquiry is "inherently fact intensive"). Many cases are made easier by the combination of words and symbols. When specific words differ, the marks are unlikely to be indistinguishable. *See, e.g.*, *id.* Olivet tries to leverage this principle. It says its logo never appears without "SwissTech." That seems true to an extent—both the logo and the word are somewhere on the product or website listing. *See, e.g.*, Dkt. 281-5 at 7; Dkt. 296-7 at 2. For example, "SwissTech" might appear on a suitcase's handle, while the logo is on the front of the bag. *See* Dkt. 281-5 at 7. But in viewing the marks (1) as used on actual merchandise, (2) from the average consumer's perspective, and (3) drawing all inferences in favor of Wenger, a reasonable jury could find that consumers are likely to notice the logo on the front of the bag by itself.

Narrowing this motion to just the symbols makes this claim tough to resolve on summary judgment. The task is simply to compare the marks and decide how similar they are, which is usually the jury's job. *See United States v. Chong Lam*, 677 F.3d 190, 205 (4th Cir. 2012). So it is unsurprising that a court rarely finds two marks "so divergent that, as a matter of law, no rational jury could find one was a counterfeit of the other." *Id.* at 199. So too here. "The fact that the designs are similar in a general sense, but different in several respects, prevents the Court from determining at this stage that they are substantially indistinguishable. Resolving that question is, at bottom, a factual issue for a jury to decide." *Coach, Inc. v. Citi Trends, Inc.*, 2019 WL 1940622, at *4 (C.D. Cal. Apr. 5, 2019).

This is not to say that counterfeiting claims can never be decided on summary judgment. But here, the parties have presented little evidence beyond the marks themselves. In most cases, that lack of evidence would hurt the plaintiff (Wenger) because it bears the burden of proving its claim at trial. But because the jury can simply compare the marks and, at this stage, the evidence must be viewed in the light most favorable to Wenger, Olivet must do more to show that no reasonable jury could find the marks substantially indistinguishable.

That said, Olivet's evidence may still be relevant outside the "substantially indistinguishable" inquiry. Although it was not the subject of this motion, a plaintiff on a counterfeiting claim must also show likelihood of confusion. *See McCarthy on Trademarks and Unfair Competition* § 25:15.50. In *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074 (9th Cir. 2020), the Ninth Circuit found that two identical word marks were not likely to confuse because, among other things, the products were different and many competitors used similar marks. *Id.* at 1080; *but see Off-White LLC v. anogar-32*, 2022 WL 846755, at *3 (S.D.N.Y. Mar. 22, 2022) (finding that counterfeit marks are inherently confusing). The Second Circuit has also said that product similarity is relevant to likelihood of confusion. *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005). And the existence of competing marks goes to the strength of the mark, which is the first of the Second Circuit's *Polaroid* factors. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256 (2d Cir. 1987).

Here, SwissTech could try to convince the jury that, although the products are similar, the appearance of "SwissTech" somewhere on the luggage dispels confusion. And, as discussed below, there are many similar marks used for luggage. The number of similar marks also goes to a broader point. The marks share a common inspiration: the Swiss flag. Importantly, that inspiration is unprotectable. 15 U.S.C. § 1052(b). Although neither side has said (at least on this motion) that the other's mark is unprotectable, their unprotectable cores might influence their distinctiveness and strength as marks. *Cf.* Mark P. McKenna, *Criminal Trademark Enforcement and the Problem of Inevitable Creep*, 51 Akron L. Rev. 989, 1016–17 (2017); Mark A. Lemley & Mark P. Mckenna, *Scope*, 57 Wm. & Mary L. Rev. 2197, 2259 (2016).

## II.  Wenger's mark is not famous, so it is not entitled to anti-dilution protection

### A.  Legal background

Under 15 U.S.C. § 1125(c)(1), a mark can be diluted only if it is famous. Under § 1125(c)(2)(A), "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." In making this decision, "the court may consider all relevant factors, including the following:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

*Id.*

The Second Circuit has told district courts to police this line strictly. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009) (noting that the fame requirement "significantly limits the pool of marks that may receive dilution protection"). That is for good reason. A dilution claim empowers a mark holder to sue someone for coming too close to its mark. That is an anticompetitive, "extraordinary power." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001); *see also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 449 (2d Cir. 2004) ("[T]he senior mark [must] be truly famous before a court will afford the owner of the mark th[ose] vast protections."). So it is given to "very few" marks. *McCarthy on Trademarks and Unfair Competition* § 24:104. "Only trademarks that enjoy such broad renown so as to at least approach (if not attain) the status of 'household names' may qualify as famous marks under federal law." *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 283 (S.D.N.Y. 2016), *aff'd*, 699 F. App'x 93 (2d Cir. 2017).

"Accordingly, where it is possible for a district court to determine in the first instance the issue of the famousness of a senior mark, the court would be well advised to do so." *Savin*, 391 F.3d at 450; *see also McCarthy on Trademarks and Unfair Competition* § 24:104 (collecting cases dismissing dilution claims on Rule 12(b)(6) motions).

Examples are helpful. In passing, courts have mentioned Coca-Cola, Nike, Budweiser, Dupont, Buick, Kodak, Camel, and Barbie as heartland examples of famous marks. *Luv N' Care, Ltd. v. Regent Baby Prod. Corp.*, 841 F. Supp. 2d 753, 758 (S.D.N.Y. 2012); *DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018); *TCPIP*, 244 F.3d at 99. Notice that one doesn't even need to specify the products that these marks are used for. The Restatement of Unfair Competition focuses on that quality in determining fame. *See* Restatement (Third) of Unfair Competition § 25 (1993).

On the other side, even some well-known marks have been held not to be famous: App Store, Coach, Maker's Mark's bottle top with dripping red wax, Monster Energy's M-Claw logo, S&P for financial data services, Tinder Mobile for the dating app, the University of Texas's longhorn logo, and WIRED magazine. *McCarthy on Trademarks and Unfair Competition* § 24:109 (collecting cases). Though these cases were in various procedural postures and come from various district courts, they illustrate fame's high bar.

As for the statutory factors that a court "may" consider, "courts generally have limited famous marks to those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public." *Heller Inc. v. Design Within Reach, Inc.*, 2009 WL 2486054, at *3 (S.D.N.Y. Aug. 14, 2009). But fame is more than a "dollar test." *Glob. Brand Holdings, LLC v. Church & Dwight Co.*, 2017 WL 6515419, at *5 (S.D.N.Y. Dec. 19, 2017). In weighing the factors, courts should not lose sight of the "heart of the matter: the knowledge and impact of the mark on the mind of the 'general consuming public of the United States.'" *McCarthy on Trademarks and Unfair Competition* § 24:106.

### B. Judging Wenger's mark

In light of the above, Wenger's mark is clearly not famous. While it may be well-established, it is not a "household name" in the same category as Starbucks, Rolex, Budweiser, or Nike. *Cf. Starbucks*, 588 F.3d at 105; *Rolex Watch U.S.A., Inc. v. Rolex Deli Corp.*, 2012 WL 5177517 (S.D.N.Y. 2012).

   *1. Wenger has not produced evidence of a connection between Swiss Army knives and its mark*

Wenger largely tries to bootstrap its fame from that of Swiss Army knives. And it's true that some courts, in dicta, have referred to the Swiss Army knife as "famous" and "renowned." *Victorinox AG v. B & F Sys., Inc.*, 114 F. Supp. 3d 132, 140 (S.D.N.Y. 2015); *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 405 (2d Cir. 1997). But even if the Swiss Army knife is famous in the legal sense, that fame cannot be transferred to Wenger's mark based on the evidence in the summary-judgment record.

For starters, Wenger no longer makes Swiss Army knives. Ten years ago, it assigned the rights to "Swiss Army" to its parent company, Victorinox. Dkt. 276 at 22. And Victorinox uses a different logo:



*See id.* ¶ 20.

Wenger doesn't say how many Swiss Army knives bore its logo before 2014 or how many have after. But it does note that Victorinox "continues to sell the knives bearing the Wenger Emblem to date." Dkt. 282 at 17. But the word "knife" would be more appropriate. Of the 276 Swiss Army knives available for purchase on Victorinox's website, just one bears Wenger's logo. Dkt. 296-8. And it's not exactly prominently displayed. None of the dozens of knives displayed on the homepage bears Wenger's mark; it can be found only after substantial scrolling or searching specifically for the product. *Id.* And even then, the product description specifically calls attention to the fact that the knife is sold "with Wenger Logo." Victorinox, https://www.victorinox.com/us/en/Products/Swiss-Army-Knives/Small-Pocket-Knives/Wenger/p/0.6423.91. If anything, that calls attention to the brands' separation rather than connection.

Without many knives to wield, Wenger largely relies on its marketing efforts to connect its brand to Swiss Army knives. For instance, it emphasizes "its association with the Swiss" and that it has been a "Swiss Company since 1893." Dkt. 281-2 at 66:16–17; Dkt. 281-25 at 7. But, of course, being a Swiss company is a far cry from being thought of as the maker of Swiss Army knives. More to the point, Wenger points to its labels that read, "From the Maker of the Genuine Swiss Army Knife" under the logo. *See, e.g.*, Dkt. 281-25 at 3. It also has a version of its logo

(registered six months ago) that uses the Wenger symbol alongside the phrase "Maker of the Original Swiss Army knife." Dkt. 276 at 25. Lastly, its website has an "about us" page that documents the historical connection. Dkt. 281-14 to -16.

This evidence falls far short of establishing a genuine dispute. "'Effort' toward achieving fame is not equ[al] to having achieved the requisite fame." *Glob. Brand Holdings*, 2017 WL 6515419, at *5. Although Wenger presents evidence of its effort, it has no evidence of anything to show for it. It asserts that "it is simply inconceivable that a consumer" would fail to "understand that the [Wenger] Marks are connected to and emanate from the same source as the Swiss Army Knife." Dkt. 282 at 12, 10. But Wenger "does not provide any factual detail" to back this up. *Glob. Brand Holdings*, 2017 WL 6515419, at *5. It has not produced surveys, news reports, or any other evidence that anyone other than Wenger associates its brand with Swiss Army knives. A reasonable jury could not look at a handful of labels, a website, and one knife and then make any finding about the "general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A).

### 2. *Wenger's sales and advertising fall short*

Appealing to the statutory factors, Wenger points to its sales and advertising figures. But even if extensive sales and advertising could overcome a lack of proof of actual consumer recognition, Wenger's numbers are borderline at best. Wenger claims about $100 million and $3 million in annual U.S. sales and advertising, respectively. Dkt. 276 ¶¶ 45, 56. It also says it has used its mark for fifty years. Dkt. 282 at 22.

These facts are similar to those in *TCPIP*. There, the plaintiff had $280 million in annual sales and had spent "tens of millions" in advertising over "the past decade." 244 F.3d at 99. The mark had also been used continuously for thirty years. *Id.* But the court held the mark not famous. The plaintiff did not "submit consumer surveys, press accounts, or other evidence of fame." *Id.* Nor did it describe "how effectively" the advertising dollars were spent. *Id.* Instead, the plaintiff simply provided "unsubstantiated conclusory phrases like 'the mark … has been widely recognized by American consumers.'" *Id.* So despite "considerable commercial success and growth," the mark was not famous. *Id.* at 100. In fact, it was not close: the company's "aggregate sales … since it originated … may well not equal the sales of Dupont, Buick, or Kodak in any given month." *Id.*

In key ways, the mark in *TCPIP* was stronger than the mark here. It had more sales (in absolute terms, so the difference is even greater with inflation), and similar ad spending. But just as here, there was no other evidence of fame, like press coverage or surveys. Instead, Wenger has also provided only conclusory statements about consumer recognition. And though the figures in *TCPIP* are not "'magic' threshold numbers," Dkt. 282 at 23, the court's discussion of the necessary evidence is instructive.

Wenger notes that *TCPIP* dealt with a preliminary injunction. *See* Dkt. 282 at 24. But *TCPIP* noted that the plaintiff there might be able to produce more evidence at trial. 244 F.3d at 100. That time has passed for Wenger. And in any event, Wenger hasn't shown why this difference in posture matters. *TCPIP*'s discussion of the necessary evidence applies equally at summary judgment.

6

Wenger next points to two other district court cases. But these decisions are neither binding nor especially useful. First and, according to Wenger, "[m]ost instructive," is *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 323 (S.D.N.Y. 2007). Dkt. 282 at 25. But that case involved the mark "Tempur-Pedic." Tempur-Pedic products had $2 billion in sales and the maker had spent $250 million on advertising for those products in the preceding three years. *Dan-Foam*, 500 F. Supp. 2d at 323 & n.209. Plus, the products were featured in prominent magazines, had received awards, and were used in a variety of public places, like hospitals and "Veteran's Administration facilities." *Id.* And even then, the court did not grant summary judgment on fame for either side. It held merely that a genuine dispute existed on the issue of the mark's fame. *Id.* at 324. If *Dan-Foam* is instructive, it instructs the Court to grant summary judgment for Olivet.

Second, Wenger points to *Diesel S.p.A. v. Diesel Power Gear, LLC*, 2022 WL 956223, at *16 (S.D.N.Y. Mar. 30, 2022). There, the court held the "Diesel" apparel mark famous. That case is surely better for Wenger: the annual sales and advertising figures ($129 million and $4 million) are close to those here. *Id.* at *16. Yet that mark had also "been featured in prominent publications with wide distribution throughout the United States." *Id.* Plus, there were procedural oddities. The mark had previously been held famous in a default-judgment opinion, which the court found "significant." *Id.* And the defendants did "not argue that there is a genuine issue of fact on this issue [of fame] and in fact cite[d] to no record evidence in its discussion of this element." *Id.* So even if *Diesel* was rightly decided, it should be limited to its context. *See also Glob. Brand Holdings*, 2017 WL 6515419 at *4–5 (collecting and criticizing questionable district-court decisions on fame).

### 3. Many marks are similar to Wenger's

Finally, Olivet points out that similar marks are used by many third parties. *See* Dkt. 245 at 22–23 (collecting marks). Although third-party similarity is not an enumerated factor, it is relevant to the mark's strength, which is the fame inquiry's ultimate focus. *McCarthy on Trademarks and Unfair Competition* § 24:106. In other words, "[a] mark that is merely one in a 'crowd' of similar marks will find it difficult to be 'famous.'" *Id.*

Wenger's rebuttal is that Olivet has not produced evidence that the other marks are actually used in commerce. *See Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173 (2d Cir. 1976). True, Olivet's evidence is slim: it has produced the marks' registrations and a list of websites selling luggage bearing those marks. Dkt. 245 at 22–23; Dkt. 296-1. Its argument would be stronger if it showed that the similar marks were also strong. *See Scarves by Vera*, 544 F.2d at 1173. But evidence of ten similar marks in the same industry, prominent or not, shores up the conclusions that Wenger's mark is not so dominant as to be famous and that many Swiss-related marks could be associated (even if mistakenly) with Swiss Army knives.

## III. The Court will not award fees or costs to either side at this time

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). An "exceptional" case is one that "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the

facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "[C]onsidering the totality of the circumstances," the Court cannot say that this case is exceptional at this juncture. *Id.* However, the prevailing party at trial may file a post-trial motion for attorney fees and costs if it believes that it can meet the relevant standard.

## CONCLUSION

For these reasons, Olivet's motion for partial summary judgment is DENIED with respect to Wenger's counterfeiting claim and GRANTED as to the dilution claim. Both sides' requests for fees and costs are DENIED. The Clerk of Court is directed to close Dkt. 244. The Clerk of Court is also directed to remove the "Stayed" label on ECF.

By January 19, 2024, the parties shall submit potential trial dates for the remaining claims in March, April, and May of 2024.

SO ORDERED.

Dated: January 3, 2024
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge